UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DWIGHT DAVIS, | Case No. 1:19-cv-00453-DCN |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| MINNESOTA LIFE INSURANCE COMPANY, | |
| Defendant. | |

## I. INTRODUCTION

Pending before the Court is Defendant Minnesota Life Insurance Company's ("Minnesota Life") Motion to Dismiss. Dkt. 18. The Court held oral argument on July 31, 2020, and took the matter under advisement.[1] Upon review, and for the reasons set forth below, the Court DENIES Minnesota Life's Motion.

## II. BACKGROUND

Beginning in January of 2017, Plaintiff Dwight Davis was employed by TSheets.com, LLC ("TSheets").

In November of 2017, Davis's daughter, Amelia Spivey Parkinson (age 17) left home to live with her boyfriend. Amelia and her boyfriend married on December 6, 2017.

Also, in December of 2017, TSheets announced it was being acquired by Intuit Inc.

---

[1] The Court allowed each party to supplement the record with relevant caselaw following the hearing. The Court has reviewed those submissions and the cases cited therein.

MEMORANDUM DECISION AND ORDER - 1

effective January 11, 2018.

Prior to acquisition, TSheets was a policyholder of former Defendant[2] United Heritage Life Insurance's dependent life insurance policy. Said policy was active and covered verified dependents through January 31, 2018.

During the acquisition process, Intuit requested that employees it acquired from TSheets enroll in coverage with Minnesota Life on or before December 6, 2017. Davis timely enrolled himself, his wife, and his two daughters (including Amelia). The Minnesota Life Policy (the "Policy") became effective January 11, 2018—the day Intuit officially acquired TSheets.

On January 24, 2018, Davis's daughter Amelia, and her husband, were tragically killed in a car accident.[3] Their deaths were ruled a criminal homicide and considered an accident under the Policy.

After Amelia's death, Davis filed a claim for dependent life insurance and accidental death and/or dismemberment benefits under the Policy. Minnesota Life denied Davis's claim asserting Amelia was not a covered dependent because she was married at the time of her death. Davis appealed the denial of coverage. His appeal was, likewise, denied.

Having exhausted his administrative remedies, Davis filed the instant action on

---

[2] The parties stipulated to the dismissal of United Heritage Life Insurance Company as a Defendant on April 6, 2020. Dkt. 30.

[3] At the time of the accident on January 24, 2018, both the United Heritage Life Insurance Policy and the Minnesota Life Insurance Policy were in effect. Both companies originally denied benefits and, accordingly, Davis originally sued both companies. United Heritage filed a Motion to Dismiss (Dkt. 21) the same day Minnesota Life filed its Motion to Dismiss (Dkt. 18). However, as noted, Davis subsequently dismissed United Heritage (Dkt. 30), thus rendering its Motion to Dismiss moot.

MEMORANDUM DECISION AND ORDER - 2

November 21, 2019. Dkt. 1. In his Amended Complaint (Dkt. 4), Davis alleges a single cause of action: Wrongful Denial of Benefits Under ERISA.[4] Dkt. 4, at 7.

On February 28, 2020, Minnesota Life filed the instant Motion to Dismiss. Dkt. 18.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a claim if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (citation omitted). Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) (cleaned up).[5] "This is not an onerous burden." *Johnson*, 534 F.3d at 1122.

A complaint "does not need detailed factual allegations," but it must set forth "more than labels and conclusions, and a formulaic recitation of the elements." *Twombly*, 550 U.S. at 555. If the facts pleaded are "merely consistent with a defendant's liability," or if

---

[4] ERISA is the Employee Retirement Income Security Act of 1974. 29 U.S.C. § 1001 *et seq.*

[5] The parenthetical "cleaned up," while perhaps unfamiliar to some, is being used with increasing frequency to indicate that brackets, ellipses, footnote reference numbers, internal quotation marks, alterations, and/or citations have been omitted from a quotation. For an example of its use in a published opinion, see *Lu v. United* States, 921 F.3d 850, 860 (9th Cir. 2019) or *United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017). For a more thorough discussion regarding the practicality of the parenthetical, see Jack Metzler, *Cleaning Up Quotations*, 18 J. App. Prac. & Process 143 (2017).

there is an "obvious alternative explanation" that would not result in liability, the complaint has not stated a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 682 (2009) (quoting *Twombly*, 550 U.S. at 557, 567)).

In deciding whether to grant a motion to dismiss, the court must accept as true all well-pleaded factual allegations made in the pleading under attack. *Id.* at 663. A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001).

In cases decided after *Iqbal* and *Twombly,* the Ninth Circuit has continued to adhere to the rule that a dismissal of a complaint without leave to amend is inappropriate unless it is beyond doubt that the complaint could not be saved by an amendment. *See Harris v. Amgen, Inc.,* 573 F.3d 728, 737 (9th Cir. 2009).

## IV. ANALYSIS

In its Motion to Dismiss, Minnesota Life asserts that Davis has failed to state a claim for relief under ERISA because Amelia was not a covered dependent under the Policy in that she was married at the time of her death.

Citing ERISA, Minnesota Life argues that a civil action may be brought "by a participant, beneficiary, or fiduciary [ ] to recover benefits due to him under the <u>terms of his plan</u>, to enforce his rights under the <u>terms of the plan,</u> or to clarify his rights to future benefits under the <u>terms of the plan</u>." 29 U.S.C. § 1132(a)(1)(B) (emphasis added).

Based on this statutory language, it has long been held that an essential prerequisite of any ERISA case is a plaintiff's ability to "identify a *specific* plan term that confers the

benefit in question." *Korman v. ILWU-PMA Claims Office*, No. 2:18-cv-07516-SVW-JPR, 2019 WL 1324021, at *12 (C.D. Cal. Mar. 19, 2019) (internal citations omitted) (emphasis added).

Minnesota Life argues all the Court must do, therefore, is look at the terms of the Policy in this case and it will become apparent there are no terms that provide the benefits Davis seeks. Davis counters that there are, in fact, terms that confer coverage. Procedurally, however, this creates a problem the Court must address at the outset.

## A. Posture and Scope of Motion to Dismiss

Minnesota Life is the party that raised the "terms" argument. It argues there are no terms of the Policy upon which Davis could have relied that would support the result he seeks. In response, Davis lists the terms he relied upon—specifically language from the summary plan description ("SPD").[6] In its reply, Minnesota Life argues such is improper because Davis did not ever mention this reliance in his Amended Complaint. Dkt. 4. In Minnesota Life's estimation, because this is a motion to dismiss, the Court can only consider the facts as pleaded in the complaint, nothing more. The Court agrees with this assertion, but not the outcome.

A careful review of Davis's Amended Complaint illustrates his belief that Amelia had coverage because Minnesota Life "verified" she was a qualifying and covered

---

[6] Minnesota Life disagrees that some of the referenced documents Davis relies on—specifically a "Certificates Specification Page"—functions as part of the SPD. As will be discussed in greater detail below, this is an open question discovery will flesh out. Accordingly, the Court takes no position on what constitutes the SPD at this time. That said, the Court will refer generally to these documents as a SPD in this decision for readability.

dependent. Dkt. 4, at 5-6. There is no mention of Davis's reliance on any documents—the Policy, the Certificate Specification Page, or the SPD—in his Complaint. *See generally* Dkt. 4.

This aside, in order to entertain Minnesota Life's argument (i.e. in order to look at the terms of the Policy) the Court will have to look outside the complaint. This leaves the Court in a quandary. While it is clear Davis did not plead his reliance on the terms of the contract in his Amended Complaint, now that Minnesota Life has raised the issues in its Motion to Dismiss, it stands to reason Davis should get a chance to respond. But how can Davis do that without going outside the four corners of his Complaint? One option would be to convert Minnesota Life's Motion to Dismiss into a Motion for Summary Judgment.

It is well settled that when considering a Rule 12(b)(6) challenge, a court normally cannot consider documents outside the complaint without converting it into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). That being said, a court can consider documents attached to a motion to dismiss if they "are referred to in the plaintiff's complaint and are central to his claim." *City of Inglewood v. Teixeira*, No. CV1501815MWFMRWX, 2015 WL 5025839, at *2 (C.D. Cal. Aug. 20, 2015). Here, while not included in Davis's complaint, the Policy is clearly referenced and is at issue. Therefore, the Court can consider the Policy without having to covert the present motion. *See also Wojciechowski v. Charles River Labs., Inc.*, No. 308CV00250BESRAM, 2009 WL 10708972, at *2 (D. Nev. Jan. 23, 2009) ("The Court does not consider the Summary Plan Description to be extrinsic that would operate to convert the Rule 12(b)(6) motion to a motion for summary judgment under Rule 56.").

That said, the Court must next address the single largest problem it currently has in this case. Minnesota Life asserts that various quotes and disputed terms put forth by Davis come from pages *it did not produce*. Davis claims the quotes are from Minnesota Life documents. The Court, frankly, cannot tell. The SPD—as defined by Davis—is pages 4 through 14 of Docket 25. Docket 25 is Davis's submissions of what he purportedly received from Minnesota Life. This document is titled "Group Term Life Certificate of Insurance." Dkt. 25-1, at 4. Pages 5 through 9, however, comprise a separate document titled "Certificate Specifications Page." Based upon the pagination, font, and format it is clear this document is "different." It is unclear where this document came from and who wrote it.

That said, in its own submissions (Dkt. 19), Minnesota Life has many of the same documents—each appearing near the beginning of the individual certificates or amendments (Dkt. 19, at 4-7, 30-33, 35-38, 41-44, 46-50, 53-54, 68-69). Minnesota Life's versions are each titled "Group Policy Specifications Page," and while formatted differently, contain the same information as Davis's version.

Interestingly, on the opening page of Davis's Certificate—which is clearly a Minnesota Life document—the follow language appears: "You are insured under the group policy shown on the specifications page *attached to this certificate*." Dkt. 25-1, at 4 (emphasis added). In some of Minnesota Life's documents a similar statement can be found: "This policy was issued to the policyholder on the effective date shown *on the specifications page attached to this policy*." Dkt. 19, at 2, 51. This language appears to confirm that the specifications page is part of the certificate and applies to the Policy. Now,

MEMORANDUM DECISION AND ORDER - 7

whether it was written by Minnesota Life (or Intuit for example) is not before the Court today. The bottom line, frankly, is that Minnesota Life's document "incorporated" these specifications pages. If they did not write them (and did not intend to be bound by them) they should have so indicated. Their fight, then, might be with whoever authored the specifications pages.

Regardless, this illustrates the Court's greater concern. In their briefs and at oral argument, the parties have quoted from, and referenced, their respective documents. Both sides also have called into question the quotes and documents put forth by the other side. While the quotes sometimes jive, other times they do not. Some of the documents contain certain definitions, others do not.

Minnesota Life proffers that the discrepancy exists because the documentation Davis has supplied was the SPD for *his* coverage, but that there is another supplement for dependent coverage—the one it has provided. Even taking that as true, that does not answer the question of what the Court should consider as "the Policy" when determining the applicable terms and/or definitions. Additionally, it does not answer the question of what paperwork (if any) Minnesota Life provided Davis.

To be sure, Minnesota Life's submissions in this case include many more attachments, addenda, and supplements than what Davis has provided the Court. Furthermore, in reviewing all of the submissions, the Court readily admits that some of the quotes provided by Minnesota Life appear detrimental to Davis's claims, others not so much.  Nevertheless, the Court still has no way of knowing at this stage which of these attachments, riders, supplements, or addenda were provided to Davis, which applied to

Davis and his family, and/or which were in effect during the relevant time period.

Thus, while the Court does not have a problem—procedurally—with considering these documents that are outside of the Amended Complaint, the situation is so convoluted it frankly *cannot* make an accurate decision at this stage.

The Court does not like to delve into issues not properly before it, but it is even more reluctant to dismiss with leave to amend (without addressing the substantive arguments already presented) only to be right back where it is now or to incur another round of briefing and oral argument when discovery is clearly necessary in this case to sort out the myriad of conflicting issues. Such a course of action would waste the time and resources of all involved and unnecessarily delay the case. In sum, judicial economy dictates that the Court address the arguments raised now even if the parties raised them in a somewhat procedurally questionable manner.

The Court turns next to the party's substantive arguments. As previously noted, Minnesota Life asserts that the terms of the Policy preclude Davis's claim, that any verbal communicates are irrelevant, and that the doctrine of reasonable expectations does not apply. Davis counters that not only are the terms of the Policy ambiguous and conflicting, but in addition, he never even received or reviewed the actual Policy, only the SPD. Davis also maintains that someone from Minnesota Life "verified and approved" his family coverage—including Amelia—and that this gave him a reasonable expectation of coverage. The Court will address each assertion in turn.

### B.  Terms of the Policy

This dispute can be summed up as follows: are married children covered under the

terms of the Policy? Minnesota Life argues that it is clear from the terms of the Policy that married children *are not* covered dependents. Davis disagrees, asserting that married children are, in fact, covered dependents—or at least they are in some circumstances.

On the "Child Life Insurance" summary page, under the subheading "GENERAL PROVISIONS FOR DEPENDENTS INSURANCE," the SPD states:

> Children are eligible from live birth up to the end of the calendar month in which they attain age 26.
>
> Children age 26 or older who are physically or mentally incapacitated and were covered by the certificate holder's plan prior to attaining age 26, can continue coverage as long as they remain unmarried, disabled and dependent on the certificate holder for more than one-half of their support and maintenance.

Dkt. 25-1, at 7.

Davis interprets this explanation to mean children are considered covered dependents until age 26 *regardless* of whether they are married or not. Children *over* the age of 26 can stay on the plan, but only so long as they are unmarried *and* physically or mentally incapacitated. Davis asserts that there is no alternative clear definition of the term "dependent" anywhere on these summary pages, let alone one that excises married children from the definition of dependent, and, therefore, his interpretation is reasonable.

Davis also highlights other places in which the word "unmarried" appears in the documents he was provided. For example, an educational benefit is discussed in the "Accidental Death and Dismemberment Certificate Supplement," section of the Policy. The language in that section outlines the amount of educational benefits the Policy will pay on a pro rata basis to any dependent based upon various factors such as the dependent's

age and school status (high school, college, etc). In this section, dependent is defined as "your *unmarried* child(ren)." Dkt. 25-1, at 19 (emphasis added).

In Davis's estimation, because "dependent" is defined in different ways in different sections of the SPD, it is not unreasonable to conclude that the definition of dependent in the educational section applies solely to that section. Furthermore, Davis points to the fact that "dependent" *is not* actually defined on the "Definitions" page of the SPD—thereby implying there is no single definition for dependent that applies to all coverage benefits, addenda, and supplements.

Minnesota Life does not dispute the language on the SPD per se,[7] however, it points to the educational benefit definition already discussed as well as one other definition (in another supplement) that, while not defining "dependent" explicitly, shed light on whether marital status can affect coverage. In the "Dependents Term Life Insurance Certificate Supplement" under the heading "What members of your family are eligible for insurance under this supplement?" the following is provided: "(3) your children and your domestic partner's children, *who are unmarried*, can be claimed by you as a federal tax dependent and who meet the age requirements as shown on the specifications page attached to your certificate." Dkt. 25-1, at 20 (emphasis added).[8]

---

[7] Minnesota Life does not dispute the language itself—Davis's recitation of the language is accurate—but, again, it disputes where this language came from and its affect, if any, on the Policy itself.

[8] As already discussed, there are competing documents at issue in this case. Because this is a Motion to Dismiss and the Court is required to accept all well-pleaded factual allegations as true, *see Ashcroft v. Iqbal,* 556 U.S. 662, 663 (2009),  it will likewise err on the side of caution and cite to Davis's versions of the various documents at this time.

Davis in turn, does not dispute this language as cited by Minnesota Life, but posits that specific definition only applies to the Term Life Insurance piece. Thus, under Davis's reading, the marital status of children is only relevant when determining the Educational benefit and/or the Dependent Term Life benefit; it does not apply to Child Life Insurance.

In fact, Davis admits in his brief that "the actual Policy includes an exclusion for married child dependents, [however] the term 'dependent' is not defined to exclude 'married' children for Child Life Insurance or AD&D in the SPD." Dkt. 25, at 9.

The Court digresses and takes a moment to talk about the purpose of an SPD and what affect it has on the parties' differing definitions in this case.

ERISA's central policy goal is to protect benefit plan participants "by requiring the disclosure and reporting to participants and beneficiaries of financial and other information . . . and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b); *accord Chuck v. Hewlett Packard Co.,* 455 F.3d 1026, 1035 (9th Cir.2006). To further this goal, employee benefit plans must provide plan participants with an SPD. The SPD is the "statutorily established means of informing participants of the terms of the plan and its benefits," and serves as "the employee's primary source of information regarding employment benefits." *Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.,* 293 F.3d 1139, 1143 (9th Cir. 2002) (cleaned up); *see also* 29 U.S.C. § 1022(a).

Section 1022(a) outlines that "The [SPD] shall include the information described in subsection (b) of this section, shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to

reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." Subsection (b), in turn, lists specific information that the SPD should contain, including any "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." *Id.* § 1022(b).

These limitations should be explained in a manner "calculated to be understood by the average plan participant," and "sufficiently accurate and comprehensive to reasonably apprise" plan participants of their rights and obligations under the plan. *Id.* § 1022(a), (b).

In addition, per federal regulation:

> Any description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits.

29 C.F.R. § 2520.102–2(b). The SPD must also disclose limitations in close conjunction to benefits provisions or refer the participant to the page numbers on which the relevant restrictions appear. *Id.*

Based upon these overarching principles, Davis stands by his position that the Certificate (Dkt. 25-1)—including the pages whose author is unknown—is an SPD, that it *does not* clearly define dependent, and that it *does not* clearly exclude married children from the benefits he seeks. In light of this belief, Davis asserts Minnesota Life should not have denied his request for coverage. Minnesota Life, on the other hand, stands by its proposition that these "specifications pages" (specifically the pages whose author is unknown) are *not* SPDs and cannot be relied upon.

MEMORANDUM DECISION AND ORDER - 13

At this stage, the Court does not know. It is unclear who produced the disputed pages and what impact, if any, they have on the Policy; it is unclear which policies, addenda, supplements, riders, certificates, or other documents were provided to Davis; and, generally speaking, it is unclear which documents, if any, constitute the SPD and whether Minnesota Life or its participants relied on those pages as a SPD or not.

As another Court aptly noted, "confusion as to what constitutes the plan for purposes of ERISA is all too common." *Sperandeo v. Lorillard Tobacco Co*., 460 F.3d 866, 870 (7th Cir. 2006) (cleaned up). The situation before the Court is a prime example of this confusion. Whether a Certificate of Insurance and/or Certificate Specifications Page is considered part of the SPD is an open question as well. *See, e.g., Vastag v. Prudential Ins. Co. of Am.*, No. CV156197KSHCLW, 2018 WL 2455921, at *7 (D.N.J. May 31, 2018) (noting that the policy included the group contract, the certificate of insurance, and the SPD: three separate documents); *Yaeck v. Life Ins. Co. of N. Am*., No. CIV. 11-2056 ADM/SER, 2012 WL 359913, at *2 (D. Minn. Feb. 2, 2012) (certificate specifically stated that it, along with other documents, "made up the SPD as required by ERISA"); *but see Weaver Bros. Ins. Assocs. v. Braunstein*, No. CIV.A. 11-5407, 2014 WL 2599929, at *13 (E.D. Pa. June 10, 2014) (finding the Certificate of Insurance was not part of the SPD).

In sum, the Court can hardly evaluate the terms of the Policy if it does not know which documents actually constitute the Policy—including what documents make up the SPD. At this stage, the Court finds that Minnesota Life has not carried its burden. It cannot affirmatively show that the terms of the Policy foreclose Davis's claims. Discovery is clearly necessary to flesh out what constituted the Policy and the SPD in this case, who

authored the various documents, which documents were in effect during the relevant time period, and which documents Davis was aware of.

### C. "Verified" Coverage and the Doctrine of "Reasonable Expectations"

Unlike the prior discussion—which, as noted, was not specifically raised in Davis's Amended Complaint—the present argument was. In his Amended Complaint, Davis clearly states that Minnesota Life verified all of his family's information, granted coverage, and that he reasonably relied on that determination. Dkt. 4, at 5-6.

Davis's argument cuts both ways, however. Davis claims that because Minnesota Life approved coverage it means Minnesota Life *knew* Amelia was married and *knew* they had to cover her. First, it is unclear whether Minnesota Life knew Amelia was married or not. Davis points to a document that lists "proof of marriage" as a "document received" by Minnesota Life. The problem, however, is that this document appears to have been created by Intuit, not Minnesota Life. In addition, the Court cannot tell whether this proof of marriage notation was in reference to Amelia's marriage certificate or Davis's.[9] It very well could be Amelia's, but the Court cannot definitively say at this time. In addition, even assuming Minnesota Life knew Amelia was married, that does not necessarily mean it knew it had to cover her under the child life insurance provisions at issue in this case. This would be the situation in light of Minnesota Life's disagreement regarding whether the unmarried language applied to Amelia or not. In other words, even if Minnesota Life *knew*

---

[9] All Tsheets employees had to enroll with Minnesota Life by December 6, 2017—the same day Amelia was married. Unless Davis sent in Amelia's proof of marriage after the deadline (which is entirely possible) it seems unlikely he would have able to submit a copy of the marriage certificate the same day the marriage took place.

Amelia was married and approved coverage generally, that does not mean they agreed she was covered under certain plan provisions and not others.

Citing two cases, Minnesota Life argues this is all irrelevant because "verbal representations cannot supersede the written terms of an ERISA plan, as a matter of law." Dkt. 18-1, at 5. The Court agrees, in part, with this statement. If Davis was relying solely on verbal statements, the Court notes that such would likely be insufficient to withstand scrutiny unless the Court could find "any representation [] made by the employer to the participants that would justify a reasonable belief by the participants that, in any respect relevant to the issues presented[], their rights . . . were greater than, or different from, the rights and obligations described in the plan document and the plan agreements . . . ." *Carrabba v. Randalls Food Mkts., Inc.*, 145 F. Supp. 2d 763, 770 (N.D. Tex. 2000), *aff'd*, 252 F.3d 721 (5th Cir. 2001). Furthermore, the two cases cited by Minnesota Life were both decided at the summary judgment stage, *after* the terms and scope of the Policy had been determined, as well as the substance, context, and extent of any other representations—verbal or otherwise.

More importantly, however, Davis is not relying exclusively on verbal communications in this case, but the aforementioned documents which, by all accounts, appear to approve coverage for Amelia.

This brings the Court to Davis's interrelated and final argument. Davis contends that regardless of the language in the SPD and/or any verbal representations he may have received, his understanding from these documents was that Amelia had been verified and was approved for coverage under the Policy. Davis relied on that representation, and

MEMORANDUM DECISION AND ORDER - 16

Minnesota Life cannot take coverage away now.

Over the years, federal courts have adopted the "doctrine of reasonable expectations" to supplement the explicit provision and general policies set out in ERISA. *See Scharff v. Raytheon Co. Short Term Disability Plan*, 581 F.3d 899, 904 (9th Cir. 2009). The Ninth Circuit "gave two reasons for adopting the doctrine into the federal common law: (1) protecting the reasonable expectations of insureds appropriately serves the federal policies underlying ERISA, and (2) at least thirty states had explicitly incorporated the reasonable expectations doctrine into their own law, demonstrating its widespread acceptance and vitality." *Id.* at 905 (cleaned up).

This doctrine is summarized as follows:

> Under the so-called "doctrine of reasonable expectations," which is often applied in interpreting or construing policies of insurance, the meaning of an insurance policy is determined in accordance with the reasonable expectations of the insured. In other words, the meaning of the terms in an insurance policy is to be determined by considering it in light of whether a reasonable person in the position of the insured would expect coverage. The term "insured's reasonable expectations" refers to what a hypothetical reasonable insured would glean from the wording of the particular policy and kind of insurance at issue, rather than how a particular insured who happened to buy the policy might understand it.

*Id.* at 904–05 (quoting 16 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 49:20, at 111–12 (4th ed. 2000) (footnotes omitted)).

As noted, Davis feels that because Amelia's coverage was verified and the exclusion (for married children) was "buried within the voluminous documents making up the plan itself," Dkt. 25, at 11, he had a reasonable expectation in coverage.

Minnesota Life points out that the doctrine of "reasonable expectations" only

applies when construing an ambiguous written contract term. Even the case cited by Davis explains this concept. *Scharff,* 581 F.3d at 906 (noting that the doctrine of "reasonable expectations" "grew out of the law of adhesion contracts and construction of ambiguities in insurance policies" (cleaned up)).

Because Davis does not outline in his Complaint any ambiguity in the plan itself, but simply that the information in the SPD was "insufficient" to put him on notice of any marriage exclusion,[10] Minnesota Life asserts the reasonable expectations doctrine does not apply.

For further support, Minnesota Life points to a Ninth Circuit case, *Emberton v. Hartford Life Insurance*, 977 F.2d 588 (9th Cir. 1992), where an insured argued that the policy was ambiguous because the "Policy Specifications Page" only stated the duration of the period of coverage, whereas the policy contained additional requirements for coverage. *Id.* at 588. The Ninth Circuit explained, however, that the policy itself set forth the additional conditions for benefits, and the lack of such conditions in a "Policy Specifications Page" did not create an ambiguity. *Id.*

Minnesota Life asserts this case is similar and that Davis cannot claim the language in the Specifications Page under "Age Requirements" creates an ambiguity because the Policy sets forth the actual language clearly. The Court disagrees.

As a threshold matter, *Hartford* is a two-paragraph, *unpublished* decision from 1992. Pursuant to Ninth Circuit Rule 36-3, this case holds no precedential value and in fact

---

[10] Arguably the SPD language concerning coverage for married dependents is not only insufficient, but actually *conflicts* with the Plan definitions—assuming Davis's interpretation of course.

*cannot* be cited to this Court except in rare circumstances, none of which are present here.

Second, while the general principle from *Hartford* is understandable, it does not seem to fit this case as Davis does not claim there was additional language in the Policy that clarified his question (like in *Hartford*), but that he was never actually provided the Policy and, furthermore, that there is an ambiguity in the language of the SPD vis-à-vis the language of the Policy. It is clear Davis's argument is that the SPD outlines a definition that appears to include married dependents while the Policy lists married dependents as excluded from certain coverages.

Minnesota Life then cites *Scharff* and points out that the Court there noted that plan participants are expected to "read, in its entirety" any plan they seek benefits under, and that because the plaintiff in that case had access to the full plan, there was no excuse for her failing to understand her benefits. *Scharff*, 581 F.3d at 907.

Minnesota Life tries to equate that holding to this case by asserting that because the SPD indicated that participants could "examine the group policy at the principal office of the policyholder," Davis could have easily learned that married children were excluded from coverage. Again, the Court disagrees. There is a difference, however, between having access to a plan (i.e. having a booklet) and failing to follow through and being required to go to the policyholder's office to ascertain what your benefits are.

Presumably for this very reason, Minnesota Life (as most insurers do) sent out SPDs to the individuals it insured as a way for them to understand their benefits. The Court is not convinced that Davis should have, could have, or would have had easy and ready access to Minnesota Life's entire Policy. Ultimately, Minnesota Life has not persuaded the Court

that the doctrine of reasonable expectations is unavailable to Davis in this case.

## V. CONCLUSION

In some respects, the parties are treating this as a motion for summary judgment and asking the Court to affirmatively take a position on whether married children were covered under the Policy or not. Additionally, the parties ask the Court to effectively determine what Davis knew, thought, or perceived about his coverage. However, at this stage, the Court must take all of Davis's alleged facts as true. Minnesota Life has called into question those assertions by claiming they are unreasonable.

However, the Court cannot make any such rulings at this time. To be frank, the Court is unsure whether married children are included or excluded under the Policy and/or if they are included or excluded under only certain benefit portions of the Policy. It is not unreasonable for Davis to take the same position. Discovery will flesh out how Minnesota Life interprets its policy, what Davis knew or did not know, and ultimately, whether his reliance was reasonable or not. At this stage, however, the Court cannot find in favor of Minnesota Life. It has not met its burden in establishing that Davis's claim fails under Federal Rule of Civil Procedure 12(b)(6). Accordingly, the Motion to Dismiss must be DENIED.[11]

---

[11] As a separate matter, Davis also claims the SPD does not clearly inform plan participants that there is a reduction in the "face value" of the coverage for spouses and dependents. Minnesota Life counters that it is clear on the face of the documents that the values are reduced. The Court notes its *initial* agreement with Minnesota Life on this issue. Again, however, once the parties have engaged in discovery, the Court will be in a better position to determine what Davis knew (or understood) concerning the policy's face value and whether that understanding was reasonable.

MEMORANDUM DECISION AND ORDER - 20

## VI. ORDER

1. Minnesota Life's Motion to Dismiss (Dkt. 18) is DENIED.

2. The Court previously stayed all outstanding deadlines pending the instant decision. Dkts. 44, 45. Accordingly, within fourteen (14) days of the date of this order, the parties shall meet and confer and submit new dates for any remaining deadlines.

DATED: October 21, 2020

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 21